**Benjamin GROSS, Plaintiff,**

v.

**GFI GROUP, INC. et al., Defendants.**

14cv9438

United States District Court, S.D. New York.

Signed February 9, 2016

David R. Scott, Stephen J. Teti, Scott and Scott, Attorneys at Law, LLP, Colchester, CT, Jack I. Zwick, Weiss & Lurie, Joseph Peter Guglielmo, Joseph Daniel Cohen, Scott–Scott, Attorneys at Law, LLP, New York, NY, for Plaintiff.

Paul K. Rowe, Wachtell, Lipton, Rosen & Katz, Sameer Nitanand Advani, Tariq Mundiya, Todd G. Cosenza, Willkie Farr & Gallagher LLP, New York, NY, for Defendants.

### MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge:

Benjamin Gross brings this 10b–5 securities class action on behalf of himself and similarly situated holders of GFI Group, Inc. ("GFI") stock between July 30, 2014 and September 8, 2014. Gross's Second Amended Complaint ("SAC") alleges that GFI executives made misstatements about the benefits of a proposed merger transaction, leading shareholders to sell their GFI shares prematurely. For the reasons set forth below, Defendants' motion to dismiss the Second Amended Complaint is denied.

### BACKGROUND

GFI is a financial-services corporation that provides inter-dealer broker services and proprietary financial software products. (SAC ¶ 38.) Until April 9, 2015, GFI was publicly traded on the New York Stock Exchange. (SAC ¶ 37.)

In 2013, GFI executives asked Jefferies LLC to appraise the company with a view to selling it. (SAC ¶¶ 71–80.) Jefferies advised GFI that the "sum of [GFI's] parts" could be sold at a "64% premium to current price" or "$5.41/share." (SAC ¶ 14;

SAC Ex. 7). Jefferies suggested that GFI's "[o]ptimal approach" would be to sell its brokerage business to another inter-dealer broker such as "ICAP or Tullett," retaining the option to sell its financial software products, Trayport and FENICS, to another buyer. (SAC ¶¶ 76–79; SAC Ex. 7.)

At a 2013 board meeting, Michael Gooch, GFI's Founder, Executive Chairman, and largest single shareholder,[1] expressed support for a different transaction. Gooch hoped to sell GFI to CME Group ("CME"), which operates the Chicago Mercantile Exchange. (SAC Ex. 10.) And if CME acquired GFI, it would permit a private consortium—including Gooch and GFI's Chief Executive Officer Colin Heffron—to purchase GFI's inter-dealer broker business at a substantial discount. (SAC ¶ 2, SAC Ex. 10.) Jefferies had not recommended CME as a proposed buyer because CME lacked an inter-dealer broker business, a component that would likely lead buyers to pay more for GFI in order to benefit from commercial "synergies." (SAC ¶ 76.) Sparing no quarter, Gooch stated that he would not vote for any transaction unless it permitted his investor group to purchase the inter-dealer broker business. (SAC Ex. 10.)

On July 29, 2014, GFI's board met to consider the merger agreement with CME. (SAC ¶ 85.) Under the terms of the deal, GFI shareholders would receive $4.55/share—46% above GFI's current trading value, but 15% less than Jefferies estimated that GFI would earn if it sold itself to a company with an inter-dealer broker business. (See SAC ¶ 48.) That day, BGC Partners, an international brokerage company that had previously expressed interest in GFI, sent a letter indicating its desire to negotiate an acquisition. (SAC ¶¶ 54–60.) GFI's board discussed the letter, but yielded to Gooch and authorized the CME transaction pending shareholder approval. (SAC ¶¶ 48, 85.)

On July 30, GFI announced the proposed merger with CME. (SAC ¶ 48.) At that time, Gooch commented that he was "very pleased to announce this transaction with CME Group and the substantial premium and liquidity it delivers to our stockholders." (SAC ¶ 49.) Further, Gooch stated that "[o]ptimizing GFI's value for stockholders has been a goal of management since becoming a public company in 2005 and this transaction represents a singular and unique opportunity to return value." (SAC ¶ 49.) Heffron added that the transaction "unlocks the substantial value of our Trayport and FENICS technology businesses in a tax efficient manner." (SAC ¶ 50.) The day following the merger announcement, GFI's stock price rose from $3.11 to $4.52, approximating the share price that would result from the CME merger. (SAC ¶¶ 22, 48.) Thereafter, GFI rebuffed BGC's efforts to acquire it. (SAC ¶ 58.)

Undeterred, BGC made a tender offer directly to GFI's shareholders on September 9. (SAC ¶ 7.) A bidding war ensued between BGC and CME. (SAC ¶ 9.) Ultimately, BGC offered $6.10/share, 34% more than GFI's shareholders would have received from CME. (SAC ¶¶ 88.). At the January 30, 2015 shareholder meeting, GFI shareholders rejected CME's offer. (SAC ¶¶ 88.) Subsequently, BGC completed its tender offer and obtained a controlling interest in GFI.[2] (SAC ¶¶ 88, 91.)

---

**1.** Gooch controlled "approximately 38% of GFI" as "a representative of Jersey Partners, Inc." (SAC ¶ 6.)

**2.** On December 11, 2015, BGC sold GFI's Trayport business to Intercontinental Exchange, Inc. See BGC *and GFI Complete Sale of Trayport to Intercontinental Exchange,* BGC PARTNERS, http://www.bgcpartners.com/wp-

Gross seeks to represent a class of GFI shareholders who sold their stock after Gooch and Heffron's statements on July 30, 2014, but before BGC announced its tender offer on September 9. Gross alleges that Gooch and Heffron's statements led him to believe that the CME transaction was the best opportunity for GFI shares to gain value, and that GFI's value would not increase as it came closer to selling its prized asset to corporate insiders. (SAC ¶ 103.)

## LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). To determine plausibility. courts follow a "two-pronged approach." *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937. First, a court must take the plaintiff's "factual allegations to be true and draw[ ] all reasonable inferences in the plaintiff's favor." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir.2009) (citation omitted). But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir.2010) (quoting *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937).

■ Under Fed.R.Civ.P. 9(b), a securities fraud complaint must satisfy heightened pleading requirements, "stating with particularity the circumstances of fraud." *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 304 (2d

Cir.2015) (citation omitted). Additionally, the PSLRA requires that the complaint state with particularity "each statement alleged to have been misleading," the "reason or reasons why the statement is misleading," and facts "giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u4(b)(*l*)(B); § 78u4(b)(2)(A).

■ Rule 10b–5, as authorized by Section 10(b) of the Securities Exchange Act, prohibits the "mak[ing] [of] any untrue statement of material fact" in connection with the purchase or sale of a security. 17 C.F.R. § 240.10b–5(b). A plaintiff must allege that the defendant "(1) made mi sstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *Blanford*, 794 F.3d at 305 (citation omitted).

## DISCUSSION

In its motion to dismiss, GFI argues that the alleged misstatements were "puffery," and that unless those misstatements are actionable, Gross has merely pled state-law fiduciary duty claims. GFI also argues that Gross fails to plausibly allege loss causation.

### I. "Puffery"

■ Defendants' first argument concerns the difference between subjectively false statements and "puffery" under the securities laws. Defendants may be liable under Rule 10b–5 for "subjective" statements, such as expressions of one's opinion or belief about a security's value. *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1088, 1093, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) (holding, in Section 14(a) case, that defendants' representations that a share price was "high" and

content/uploads/2015/12/Final-Trayport- Completion-Release.pdf.

"fair" were actionable misstatements); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1131 (2d Cir.1994) (applying *Virginia Bankshares* in a 10b–5 case). For the statement to be material, the plaintiff must allege that the defendant who made the false statement had "expertise," had "access to internal corporate information," owed an "obligation to exercise judgment in the interest of the stockholders" and knew "the statement to be false." *Shields*, 25 F.3d at 1131.

■ By contrast, a statement is mere "puffery" when it is so non-specific that no reasonable shareholder would have deemed it material. *See, e.g., Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir.2004) (mere "expressions of puffery and corporate optimism do not give rise to securities violations"). Decisions in this Circuit concluding that statements were mere puffery have often focused on factors such as the imprecision of the statements and whether they related to future expectations. *See, e.g., Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir.1996) (per curiam) (claims in Form 10–K that "diversification [would] play an important role" and that company would "not compromise its financial integrity" were puffery); *San Leandro Medical Grp. Profit Sharing Plan v. Philip Morris*, 75 F.3d 801, 810–11 (2d Cir.1996) (statements that company was "optimistic" about earnings and "expected" good performance were puffery); *Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 153 (2d Cir.2013) (headline in press release describing results of findings as "encouraging" was puffery). There is no canonical test for how vague a statement must be to qualify as puffery.

■ Statements are not puffery if shareholders could reasonably interpret them as material misstatements. For example, in *In re Bayer AG Securities Litig.*, No. 03–cv–1546, 2004 WL 2190357 (S.D.N.Y. Sept. 30, 2004), this Court held that Bayer's characterization of certain product-liability litigation as "groundless" was not puffery when Plaintiffs alleged that Bayer had reason to believe its brands were at risk. *Bayer*, 2004 WL 2190357 at *14. In *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F.Supp.2d 223 (S.D.N.Y.2012), a court held that a statement that the defendant was "in compliance with all applicable environmental laws" shortly before the Deepwater Horizon explosion could have been material to shareholders who chose to invest in the oil drilling industry. *Transocean*, 866 F.Supp.2d at 244. And in *Novak v. Kasaks*, 216 F.3d 300 (2d Cir.2000), the Second Circuit held that statements describing a retailer's inventory as "in good shape" and "under control" were not puffery when defendants "allegedly knew that the contrary was true." *Kasaks*, 216 F.3d at 315. While statements about "singular" opportunities to "optimize" value might be meaningless in the abstract, materiality depends upon the context in which the statement was made. *See, e.g., TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) (noting that materiality determinations turn on the "total mix" of information available to a reasonable investor).

■■ At the pleading stage, this Court finds that Gooch's statements, as alleged, are not so "obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."[3] *IBEW Local Union No. 58*

---

3. By contrast, Plaintiff has not adequately alleged that Hefffon's statement—that the CME transaction would "unlock the substantial value of our Trayport and FENICS technology businesses in a tax efficient manner"—was false. There is no allegation that the CME transaction was tax *inefficient,* or that some value was not "unlocked" by the proposed

*Pension Trust v. Royal Bank of Scotland Grp. PLC,* 783 F.3d 383, 389–90 (2d Cir. 2015). Shareholders might well believe statements by GFI's Executive Chairman that the proposed CME merger was a "singular and unique opportunity" to "optimiz[e]" value. A reasonable person could conclude that the proposed transaction would provide them with the best possible share price. And Gross alleges that Gooch knew the CME merger was not a unique acquisition opportunity, and was never intended to optimize value. Indeed, Gooch promised to refuse offers from CME's competitors because he wished to use the CME transaction to take GFI's inter-dealer broker business private. (*See* SAC Ex. 10.) [4]

Building on the assumption that the material misstatements are just puffery, Defendants assert that Gross pleads state-law claims for breach of fiduciary duty, not Rule 10b–5 claims. In *Santa Fe Indus. v. Green,* 430 U.S. 462, 466, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Supreme Court concluded that merely pleading that directors breached a fiduciary duty—absent any misrepresentation or omission—is insufficient to state a 10b–5 claim. However, *Santa Fe* is inapplicable here, where, as discussed earlier, Gross has pled affirmative misstatements that violate Rule 10b–5. Therefore, the alleged breach of fiduciary duty inheres in the 10b–5 claims.

## II. *Loss Causation*

 To survive a motion to dismiss, a plaintiff must "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo,* 544 U.S.

336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). Rule 10b–5 requires proof of two forms of causation: transaction causation and loss causation. *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.,* 343 F.3d 189, 196–97 (2d Cir.2003). "Transaction causation is akin to reliance, and requires only an allegation that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'" *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 172 (2d Cir.2005) (citation omitted). Loss causation, which is akin to the "tort-law concept of proximate cause" is the "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Emergent Capital,* 343 F.3d at 197. "[T]o establish loss causation, 'a plaintiff must allege … that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell,* 396 F.3d at 173; *see also* 15 U.S.C. § 78u4(b)(4).

 Gross's burden to plead loss causation is "not a heavy one," and when it is unclear whether the plaintiff's losses were caused by the fraud or some other intervening event, "the chain of causation is … not to be decided on a Rule 12(b)(6) motion to dismiss." *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC,* 797 F.3d 160, 187 (2d Cir.2015); *see also Carpenters Pension Trust Fund of St. Louis v. Barclays PLC,* 750 F.3d 227, 229 (2d Cir.2014) (reversing district court for "prematurely" dismissing action based on loss causation "as a matter of law and without discovery" when plaintiffs alleged that

---

CME transaction. Plaintiff does not contradict GFI's statements that the CME transaction would qualify as "tax-free" for shareholders. (SAC ¶ 48.) Plaintiff also agrees that GFI's share price rose when the proposed CME merger was announced.

4. Accordingly, it is unnecessary to address Defendants' argument that they had no omission-based duty to disclose potential merger negotiations with BFG. Regardless of whether that duty existed, Plaintiff has adequately pled affirmative misstatements by defendant Gooch.

stock prices continued to be tainted by defendants' misrepresentations). Certainly, there are some cases in which plaintiffs' loss-causation allegations are so implausible that dismissal on that basis is appropriate. *See, e.g., City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.,* 928 F.Supp.2d 705, 714–15 (S.D.N.Y. Feb. 28, 2013) (finding no plausible loss causation allegation where minor losses in value of MetLife stock coincided with "precipitous[ ]" market-wide losses after Standard & Poor's downgraded the United States' credit rating). But in most cases, "[t]he requirement … to plead a causal link does not place on Plaintiffs a further pleading obligation to rule out other contributing factors or alternative causal explanations." *Loreley,* 797 F.3d at 189.

■ Here, Gross alleges that Defendants' misstatements concealed the fact that GFI shares were substantially undervalued. Financial advisors and competitors repeatedly informed GFI that other bidders would provide better offers to shareholders. (SAC ¶ 6.) Nonetheless, Gooch told investors that the CME transaction was a "singular and unique opportunity" to "optimiz[e]" the value of their shares. (SAC ¶ 5.) And Gross adequately alleged that when management spoke, shareholders listened, choosing to sell their shares before competitors made superior offers. (SAC ¶¶ 99–103.) Given that Gross's burden at the pleading stage is "not a heavy one," Gross has adequately alleged loss causation. *See Loreley,* 797 F.3d at 160.

Finally, Defendants cite to *Gordon Partners v. Blumenthal,* 293 Fed.Appx. 815, 817 (2d Cir.2008) (summary order), for the proposition that Gross must "show" that GFI's market price between July 30 and September 9, 2014 was inaccurate because of Defendants' misstatements, "as opposed to other market factors, such as changed investor expectations, the actualization of the company's risks, or other conditions that may account for some or all" of the losses. But that case addressed a plaintiff s burden on *summary judgment,* not a motion to dismiss. *Gordon Partners,* 293 Fed.Appx. at 816; *see also Dura Pharms.,* 544 U.S. at 346, 125 S.Ct. 1627 (distinguishing burden to "prove" loss causation from burden to "allege" loss causation at the motion to dismiss stage); *Loreley,* 797 F.3d at 182 n.14 ("[W]e note that the district court viewed loss causation as an issue typically 'reserved for summary judgment,' … and that Defendants agreed [that loss causation is] … 'usually not a driver on the motion to dismiss.' ").

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is denied. The Clerk of Court is directed to mark the motion pending at ECF No. 34 as closed.

SO ORDERED.