**The 60223 TRUST, on behalf of itself and all others similarly situated, Plaintiffs,**

v.

**GOLDMAN, SACHS & CO. and Matthew Janiga, Defendants.**

**No. 03 Civ. 3548(TPG).**

United States District Court, S.D. New York.

Dec. 4, 2007.

---

451

Gregory B. Linkh, Murray, Jacqueline Sailer, Frank & Sailer, LLP, Marc Ian Gross, Pomerantz Haudek Block Grossman & Gross LLP, New York City, Andrew R. Spiegel, Philadelphia, PA, Donald Glenn Davis, Butler, Fitzgerald & Potter A Professional Corporation, New York City, Douglas M. Risen, Berger & Montague, P.C., Philadelphia, PA, Marc S. Henzel, Bala Cynwyd, PA, Sherrie Raiken Savett, Berger & Montague, Philadelphia, PA, for Plaintiffs.

David Harold Braff, Sullivan and Cromwell, LLP, New York City, for Defendant.

## OPINION

THOMAS P. GRIESA, District Judge.

This action is brought by purchasers of the common stock of Exodus Communications, Inc. pursuant to sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t, and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5. Plaintiffs bring this action as a class action. Defendants are Goldman, Sachs & Co. and Matthew Janiga, a Vice President of Investment Research and Senior Technology Analyst at Goldman Sachs.

The complaint alleges that during the class period, from January 25, 2001 through June 20, 2001, Janiga repeatedly issued false research reports containing inflated projections of Exodus's predicted financial growth and gave Goldman Sachs's highest stock rating to Exodus even though he did not believe it deserved such a rating. The complaint alleges that Janiga's false information artificially inflated Exodus's stock price and that plaintiffs suffered economic loss when the truth was revealed to the market and the Exodus stock price fell.

At a hearing on April 17, 2006, this court dismissed plaintiffs' original complaint for failure to plead loss causation. Leave to replead was granted. An amended pleading, called a "Second Amended Consolidated Class Action Complaint," was filed on May 17, 2006. Defendants now move to dismiss this complaint under Fed.R.Civ.P. 12(b)(6) and 9(b) and under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4. The motion is granted on the ground that the complaint fails to adequately plead loss causation.

### The Complaint

The following is a summary of the allegations of the complaint. In addition, this section includes statements from Janiga's research notes and reports not included in the complaint.

Ordinarily on a motion to dismiss, if "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Fed.R.Civ.P. 12(b). However, since plaintiffs have mentioned and relied on these notes and reports in the complaint, the court may consider these documents without converting defendants' motion into one for summary judgment. *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991).

*The Link between Investment Banking and Analyst Coverage*

The complaint alleges that, in general, Goldman Sachs improperly linked its analyst coverage to its investment banking needs and solicited investment banking business on this basis. Moreover, it is alleged that Goldman Sachs structured analyst compensation, reviews, and duties to ensure that investment banking was a priority.

According to the complaint, Goldman Sachs asked investment bankers to review the performance of analysts; considered the level of investment banking activity in determining an analyst's bonus; required analysts to complete a business plan detailing efforts they would undertake to generate investment banking business for Goldman Sachs; required analysts to spend up to 75% of their time focusing on investment banking matters; and offered analysts a bonus for cross-selling products of other departments, including the investment banking department. Compl. ¶ 30.

*The Relationship of Goldman Sachs and Janiga with Exodus*

The complaint details various transactions for which Goldman Sachs served as Exodus's investment banker. From March 1998 through June 2000, before the class period, Goldman Sachs served as lead manager or co-lead manager for nine offerings of Exodus stock and debt, including Exodus's initial public offering. The nine offerings raised in excess of $2.5 billion and generated tens of millions of dollars in fees for Goldman Sachs. Compl. ¶ 19. During the class period, Goldman Sachs served as joint manager for a $500 million debt offering and a $240.5 million equity offering. The initial offering of both took place on February 6, 2001. Goldman Sachs earned multi-million dollar fees for these two offerings. Compl. ¶ 21.

It is alleged that Janiga was selected by Goldman Sachs as the analyst to cover Exodus because he had a reputation for allowing investment bankers to shape his published opinions. Compl. ¶ 25. Janiga's peer reviews from before and during the class period contain comments such as "Investment bankers have a stronghold over his written work" and "Matt's written product varies widely from his actual thoughts on his companies." Compl. ¶¶ 26–29. The complaint states that with regard to Exodus, Janiga misrepresented his opinions about the stock because "he knew his true opinions would harm the lucrative investment banking and strategic advisory business that Goldman Sachs had enjoyed with Exodus, would cause the prices of Exodus stock and debt to plummet, and would threaten other high technology stock offerings that Goldman Sachs investment bankers were underwriting, such as Loudcloud, Inc." Compl. ¶ 38.

*The Ratings*

Throughout the class period, Goldman Sachs employed a four-tier rating system for equity research. "Recommended List" (RL) was the highest rating and indicated that the stock was expected to provide price gains of at least ten percentage points greater than the market. Next was "Market Outperformer" (MO), which indicated that the stock was expected to provide price gains of at least five to ten percentage points greater than the market. After MO was "Market Performer" (MP), which indicated that the stock was expected to provide price gains on par with the market. Finally, "Market Underperformer" (MU) indicated that the stock was expected to provide gains of at least five percentage points below the market. It is alleged that these ratings roughly correspond to the Strong Buy, Buy, Hold, and Sell ratings utilized by other firms. Compl. ¶ 24.

Throughout the class period, Janiga rated Exodus as a "Recommended List"

stock. The complaint alleges that Janiga gave Exodus this rating despite not believing that it deserved such a rating. Further, it is alleged that Janiga published revenue and earnings estimates for Exodus that he knew to be inflated. It is alleged that contrary to what he repeatedly stated in his reports, Janiga believed the Company "guidance" to be inflated and believed that Exodus should be sold or avoided. Compl. ¶¶ 3, 36–37.

*The Class Period*

### January 2001: The Start of the Class Period

On January 11, 2001, immediately before the start of the class period, Janiga placed Exodus on the Recommended List. That day, the stock rose over 12.8% to close at $20.35. Compl. ¶ 71. One day earlier, Exodus had closed on a $1.9 billion acquisition for which Goldman Sachs served as a strategic advisor. Compl. ¶ 23.

Two weeks later, after the close of the stock market on January 24, Exodus management reported "disappointing fourth quarter 2000 and year-end 2000 results, causing the stock to plunge in after-hours trading." Compl. ¶ 39. The complaint alleges that at the time, Goldman Sachs investment bankers were working on the Exodus debt and equity offerings that were launched on February 6, 2001. *Id.* In order to avoid an adverse impact on those offerings, Janiga published a research note on January 25 defending Exodus and reiterating his RL rating. January 25, 2001 is the first day of the class period. The complaint alleges that the January 25 research note began a "cycle of deception" that Janiga repeated over and over again throughout the class period. Compl. ¶ 40.

It is alleged that in this note, "instead of coming clean about the deteriorating picture at Exodus, Janiga kept his highest rating on the stock." Janiga stated that Exodus's first-quarter 2001 performance was "no surprise" and that a "relatively solid performance in a tough quarter signals strength." Compl. ¶ 42. The complaint alleges that Janiga "encouraged investors to ignore the Company's set-back and instead focus on a turnaround expected for the later quarters of 2001." Compl. ¶ 41. However, while not alleged in the complaint, the January 25 note also stated that "we expect continued weakness in the sector for the next two quarters at least."

The complaint also alleges that in the January 25 note, Janiga published "heavily back-end loaded" earnings estimates for Exodus for the year 2001. "Back-end loaded" means that the company is expected to have better results in the later part of the year than in the earlier part of the year. Janiga projected that Exodus would trim its first quarter per-share losses by 6.67% in the second quarter, by 26.67% in the third quarter, and by 60% in the fourth quarter, from $–0.15 to $–0.14, $–0.11, and $–0.06 respectively. He also predicted a profit of $0.12 per share for fiscal year 2002. *Id.*

It is alleged that by publishing these back-end loaded estimates that he believed were "implausible and inflated," Janiga "validated the Company's use of misleading back-end loaded estimates" and "substantially contributed to the artificial inflation of Exodus' stock price." Compl. ¶ 43.

One day later, on January 26, Goldman Sachs published one of its regular advisories, called "Internet Infrastructure Services Weekly," including comments on Exodus and other companies. This report reiterated Exodus's RL rating and stated that any "turbulence" in the first half of 2001 "could create a highly attractive buying opportunity for long-term investors." Compl. ¶ 44.

### Janiga's February 23, 2001 Internal Email

According to the complaint, while Janiga was encouraging the public to see Exodus

as a buying opportunity, he "admitted privately ... that he believed guidance for most infrastructure stocks, but especially Exodus, was inflated and that back-end loaded numbers have to come down." Compl. ¶ 45.

Specifically, on February 23, Janiga wrote an internal email to Ken Hirsch, Goldman Sachs's investment banker responsible for the banking relationship with Exodus, and Michael Parekh, the head of Internet Research. In this email, Janiga stated in part:

1) we believe that most of our cos [companies] back-end loaded 2001 numbers have to come down.

2) exds [Exodus] is a major offender of back-end loading but to lower equity numbers right after selling equity [at] 18,50 could be a problem. It would also be a problem to cut other company's numbers for aforementioned reasons and not exds.

3) we have a deal in the market and negative commentary could be a problem or used against us by morgan stanley....

if you would pls come back to me with any advice I would greatly appreciate it, as I'm not quite sure what to do. *Id.*

It is alleged that this email demonstrates not only Janiga's deception, but also his motivation for it. The complaint asserts that he did not want to undermine the 13 million share offering of Exodus common stock or cause the stock price to drop; that he did not want to impact the "road show" that Goldman Sachs was managing at the time for another client; and that he did not want to express any negativity that could impair the ability of investment bankers to win future business from companies in the internet sector. Compl. ¶¶ 46–48.

Attached to this email was a draft of a research note written by Janiga that did not lower the RL rating or estimates, but instead made only "generalized, industry-wide comments without raising Janiga's particular concerns about Exodus." Compl. ¶ 49. The complaint alleges that the last line of the email, requesting guidance from Hirsch and Parekh, demonstrates that Janiga was inviting the investment bankers to influence his decisions. Compl. ¶ 50.

Responding to Janiga's email, on February 26, Stuart Bernstein, another senior investment banker to whom the email had been forwarded, wrote in an email to Janiga that "we support your comments, Matt, we just need to make sure people don't think you were overly optimistic (conveniently) at the time of the EXDS offering: we also need to deal with the loudcloud [another client] issues—getting the deal done and the msdw [Morgan Stanley] competitive issues—are you still supportive of loudcloud?" Compl. ¶ 51.

The complaint alleges that on February 27, Janiga published the draft version of the note without revision, "omitting any reference to his true negative beliefs about Exodus" and retaining the RL rating of Exodus. Compl. ¶ 52. While not alleged in the complaint, the actual note dealt with companies in the field, mentioning a few specifically, but not Exodus. The note stated that "many infrastructure providers have built recovery assumptions into their projections and guidance for [the second half of 2001], but we are increasingly skeptical and believe fundamentals are likely to worsen before they improve." It also cautioned that "our estimates for many companies are meaningfully lower than company guidance and we expect further downward revisions to follow."

### April 2001

While not alleged in the complaint, defendants include with their papers, and plaintiffs do not dispute the legitimacy of,

an April 17, 2001 research report issued by Janiga concerning Exodus. In this report, Janiga lowered Goldman Sachs's 2001 revenue estimates for Exodus from $1.986 billion to $1.789 billion, and lowered its EBITDA estimates from $312.8 million to $202.4 million, a 35% reduction. On this day, the price of Exodus stock increased $1.08, or 13.4%, to $9.11.

On April 27, Exodus management announced that they did not make their 2001 first quarter revenue estimates and that they had reduced their 2001 full-year estimates. The complaint alleges that in response to this announcement, Janiga "dutifully issued another research note conceding the Company's miss but promising that a rebound was just around the corner." Compl. ¶ 53.

It is alleged that the note again predicted that Exodus would achieve full GAAP (Generally Accepted Accounting Principles) profitability by fiscal year 2002 and continued to maintain its RL listing of Exodus, even though Janiga "did not privately believe the shares should be bought by all, much less that they would outperform the market by more than 10%." Compl. ¶¶ 54–55. Janiga also forecast that Exodus's EBITDA (earnings before interest, taxes, depreciation, and amortization) would increase from $5.4 million in the first quarter of 2001 to over $59.8 million in each of the three remaining quarters to a total of $ 185 million for the fiscal year.

A word needs to be said about the difference between GAAP and EBITDA. GAAP is what is generally used in preparing balance sheets and earnings statements. It takes into account certain items not accounted for using EBITDA—notably depreciation. *See United States v. Rigas,* 490 F.3d 208, 216 (2d Cir.2007).

Though not alleged in the complaint, in this note Janiga also reduced Goldman Sachs's 2001 revenue estimates for Exodus from $1.789 billion to $1.513 billion. The

report further reduced Goldman Sachs's 2001 EBITDA estimates for Exodus from $202 million to $ 185 million. Finally, the report ended by stating that "while we believe the stock will be volatile in the short term, the company remains our favorite long-term hosting name . . . ."

### May 2001

The complaint alleges that on May 18, 2001, Exodus filed a supplemental prospectus listing Goldman Sachs as a "Selling Holder" of $940,000 of Exodus convertible notes. The prospectus indicated that Goldman Sachs was selling Exodus common shares and would not retain any such shares after the convertible note transaction was completed. Compl. ¶ 56.

Also in May, Goldman Sachs issued two research reports not included in the complaint. On May 7, Janiga authored a research report with a section entitled "Mass Exodus," detailing a series of departures of high level officers at Exodus. On May 11, Janiga issued another report stating that Exodus had announced further cost-containing measures, including reduced capital expenditure and headcount reductions. The report stated, "While we applaud these aggressive measures, we are maintaining our conservative EBITDA outlook."

### June 2001: The End of the Class Period

The complaint alleges that on June 1, 2001, Janiga issued a report recommending purchase of Exodus bonds "without mentioning that Goldman Sachs was in the process of unloading its Exodus Convertible Notes." Compl. ¶ 57. The note specifically stated:

Either Exodus bonds should trade tighter or Global Crossing bonds should reflect more risk. Based on this observation, we recommend buying Exodus. We are concerned about the return of demand for Exodus' services, but we

think that the company should receive an amendment to its bank debt covenants, and its liquidity is ample to weather the current challenged operating environment.

On June 11, 2001, Janiga issued a research report noting that Exodus had obtained a new customer, "logistics.com," and keeping the RL rating. Compl. ¶ 58.

It is alleged that around this time, Janiga "began to reveal his true opinion about Exodus to select institutional clients." Though he publicly kept Exodus's rating as RL, the complaint alleges he "truly believed that Exodus should be sold (or if not owned, avoided)." Compl. ¶ 59.

The complaint states that on June 14, W.R. Hambrecht & Co., another financial services firm, issued a report encouraging investors to avoid Exodus shares, stating that a turnaround was not imminent, slashing back-end loaded EBITDA estimates, projecting that Exodus would be unprofitable in 2002, and describing pricing and other pressures affecting Exodus. As a result, Exodus shares fell 16.6%, approximately three times the decline in the Nasdaq Composite Index that day. Compl. ¶ 74.

The next day, on June 15, Janiga issued a report similar to Hambrecht's. In this report, Janiga "stated that there were 'no signs of a turnaround' in the internet infrastructure sector but explained away a drop in Exodus' stock price as 'pricing pressure' due to external events, and kept Exodus on the firm's Recommended List." Compl. ¶ 61. That day, Exodus shares dropped 8%, versus a Nasdaq decline of 0.8%. Compl. ¶ 61.

It is alleged that on June 18, Janiga published another research note in which he "disclosed for the first time that he believed Exodus would be unprofitable in 2002." He "slashed his estimates for the remainder of 2001," effectively reducing the back-end loaded numbers. Compl.

¶ 62. Exodus shares lost nearly 21.5% that day and closed at $3.62. Compl. ¶ 76. Exodus's rating remained RL in this note, even though Janiga had "privately counseled institutional clients to sell or avoid the shares." Compl. ¶ 63.

After the market closed on June 20, Exodus disclosed that it would fail to meet the back-end loaded estimates. Specifically, Exodus stated it would report negative EBITDA in the second quarter of 2001 and would report EBITDA of only $80 million for all of fiscal year 2001, substantially less than the turnaround publicly predicted by Janiga. Compl. ¶ 64. June 20 is the final date of the class period.

On June 21, Janiga lowered his rating of Exodus one notch, from RL to MO. The research note containing this downgrade also stated that "liquidity doubts linger" and that while "the Company believes it is fully funded to free cash flow breakeven, we note that using more conservative macro assumptions yields a funding gap in 2002 of approximately $300M." The complaint alleges that this note conveyed to the public for the first time "the full scope of Janiga's actual belief that Exodus' shares were unlikely to perform well and its liquidity risks." Compl. ¶ 65. It further asserts that the announcements by both Exodus and Janiga "had a strong negative effect on stock price," with shares dropping more than 29.3% to $1.59, versus a Nasdaq rise of 2.9%. Compl. ¶¶ 65, 77.

The complaint states that as a result of meetings with institutional clients "at some time prior to June 18, 2001," Janiga received the following emails on June 21. Daniel Koontz of PIMCO stated:

> I wanted to write a quick email to THANK you for your candor when you came into our offices and gave me your teach-in on the company. You gave me the unbiased view, told me the negatives I needed to know—and basically gave

me the ammo I needed to prevent my PM from buying the stock.

Paul Strand of Minnesota Mutual, another institutional client, wrote to Janiga stating:

I really appreciate your straightforward comments on EXDS during our conversation last week. Looks like our worst concerns were realized yesterday. Fortunately, we were able to get out of our last piece at around $5 and avoid the recent carnage in the shares. Still painful, but it could have been a lot worse . . . thanks.

The complaint alleges that Janiga "did not share that same candor with the investing public." Compl. ¶¶ 59–60.

*Events after the Close of the Class Period*

On September 26, 2001, Exodus filed for bankruptcy under Chapter 11. The reason given for the filing was that Exodus "did not realize the revenue stream originally expected to accompany EXDS's previously aggressive growth strategy." Compl. ¶ 66.

It is alleged that in 2003, the SEC issued a complaint against Goldman Sachs accusing it of, inter alia, instituting procedures to ensure that its investment bankers influenced and controlled research published by its analysts. Goldman Sachs paid $110 million in settlement of these claims. Compl. ¶¶ 34–35.

*Reliance and Causation*

The complaint states that the fraud-on-the-market doctrine creates a presumption of reliance in this case. To establish that all the necessary factors for the fraud-on-the-market presumption have been met, plaintiffs allege the following. Defendants publicized material misrepresentations or failed to disclose material facts that would "tend to induce a reasonable investor to misjudge the value of the Company's securities"; plaintiffs and class members purchased their Exodus stock without knowledge of the omitted or misrepresented facts; Nasdaq is an efficient market; and

the market reacted to the public information disseminated by defendants. Compl. ¶ 84.

The complaint contains a section entitled "Transaction Causation." It alleges that because Goldman Sachs is one of the world's leading investment banks, its recommendations and analyses have "considerable impact" on companies' stocks. The complaint states that when Goldman Sachs first placed Exodus on the Recommended List in 1999, the stock jumped 20.6% even though the Nasdaq index rose only 2.7%. Compl. ¶¶ 69–70. Apparently Exodus was removed from the Recommended List for a time, but Janiga placed Exodus back on the Recommended List on January 11, 2001. The stock then rose over 12.8% versus a Nasdaq rise of only 7.6%. Compl. ¶ 71. Additionally, while the January 25, January 26, February 27, April 27, June 1, and June 11 reports did not cause the stock price to increase, they served to "maintain that price well above the level the stock would have traded at had Defendants truthfully disclosed their negative beliefs about Exodus." Compl. ¶ 72.

The complaint also contains a section entitled "Loss Causation." The complaint asserts that Exodus's stock price fell significantly between June 14 and June 21, during which time Janiga lowered his rating of and estimates for Exodus and "disclosures were made which together constituted a manifestation of the risks that Janiga knew to exist throughout the class period but failed to disclose in his earlier reports." Compl. ¶ 73.

*Discussion*

■ To have a valid claim under Section 10(b) and Rule 10b–5 and withstand a motion to dismiss, plaintiffs must allege the following: that defendants made misstatements or omissions of material fact, with scienter, in connection with the purchase or sale of securities, and that plaintiffs'

reliance on such statements proximately caused the claimed loss. *See In re IBM Securities Litigation,* 163 F.3d 102, 106 (2d Cir.1998).

Defendants move to dismiss the complaint on the basis that reliance and loss causation have not been adequately pleaded, and that plaintiffs have not pleaded fraud with particularity to the extent required by the PSLRA and Fed R. Civ. P. 9(b). The court will hereafter discuss the issues of reliance and loss causation. The court has determined that fraud has been pleaded with particularity to the extent required by the PSLRA and Fed.R.Civ.P. 9(b), and will not discuss this issue further.

*Reliance/Transaction Causation*

Reliance is often referred to in cases involving public securities markets as transaction causation. *See Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); *Basic Inc. v. Levinson,* 485 U.S. 224, 248–49, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Transaction causation is established by showing that "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 197 (2d Cir. 2003). In the securities litigation context, plaintiffs do not have to have purchased the securities at issue through a defendant brokerage firm. Instead, in many situations, plaintiffs can establish transaction causation simply by showing that defendants have perpetrated a "fraud on the market."

The fraud-on-the-market theory supposes that, in an open and developed securities market, a company's stock price is determined by the information about the company and its business that is available to the market. Thus, any misleading statements will be presumed to have defrauded stock purchasers even if those purchasers cannot show they have directly relied on the statements. This causal connection is "no less significant than in a case of direct reliance on misrepresentations." *Basic Inc. v. Levinson,* 485 U.S. 224, 241–42, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

Defendants object to applying the fraud-on-the-market theory in the present case, because they contend it should only be used in suits against issuers of the securities in question, not against analysts or firms being sued because of the alleged wrongdoing of an analyst, In support of this position, they cite to *In Re Initial Public Offering Securities Litigation,* 471 F.3d 24 (2d Cir.2006), in which the Second Circuit stated that "it is also doubtful whether the *Basic* presumption can be extended, beyond its original context, to tie-in trading, underwriter compensation, and analysts' reports." However, this statement was dicta, and the case involved an entirely different situation—an initial public offering—in which, as the court points out, the market for IPO shares is not efficient because there is no well-developed market in offered securities. *Id.* at 42. Further, the case cited by the Second Circuit for support of this statement, *West v. Prudential Secs., Inc.,* 282 F.3d 935, 938 (7th Cir.2002), involved non-public comments made by an analyst, which undoubtedly would not have the same effect on the market price of a security as would public disclosures by an analyst.

*Basic* itself did not specifically limit the presumption to issuers—nor has any other precedent to date. A decision in the Southern District of New York has already held that there is no reason the presumption should not apply to analyst reports. *See, e.g., DeMarco v. Lehman Bros., Inc.,* 309 F.Supp.2d 631, 636 (S.D.N.Y.2004). Thus, this court finds plaintiffs' pleading of reliance to be sufficient.

*Loss Causation*

█ Loss causation is defined as the causal link between the misconduct alleged to have occurred and the economic loss suffered as a result. *Emergent Capital.* 343 F.3d at 197. The PSLRA provides that "in any private action arising under this title, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this title caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b) (4). Defendants argue that plaintiffs have not met this burden.

The leading Second Circuit case addressing loss causation is *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005). The case was a securities class action in which the plaintiffs alleged that Merrill Lynch gave certain companies ratings of "buy" and "accumulate" even when these ratings were contrary to their true analyses of the companies.

The court stated that it is not enough to allege that a defendant's misrepresentations and omissions induced a purchase-time value disparity between the price paid for the security and its true investment quality. Such an allegation is nothing more than a claim of transaction causation, explaining why an investment is made, but does not speak to the relationship between the fraud and the loss of the investment. *Id.* at 174.

The court further stated that, to establish loss causation, a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of an actual loss suffered—*i.e.,* that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. *Id.* at 173. If a plaintiffs loss coincides with a market-wide phenomenon, the prospect of demonstrating loss causation decreases. *Id.* at 174.

The court in *Lentell* concluded that the plaintiffs had not made out a case of loss causation. The court held that it was not sufficient to allege that the "buy" and "accumulate" ratings were not Merrill's true opinions, without further alleging that Merrill falsified or concealed certain facts, which when disclosed caused a loss. Putting it another way, the plaintiffs had not alleged that Merrill had concealed a risk that led to a loss suffered by the plaintiffs. *Id.* at 175–76. The court stressed that the reports accompanying the ratings disclosed the high-risk nature of the investments. *Id.* at 176.

To reiterate, loss causation, as defined in *Lentell,* is a situation where information is concealed from the market which, when disclosed, negatively affects the value of the security. The court also spoke of loss causation as involving a concealed risk which materializes and causes a loss.

In applying the teaching of *Lentell* in the present case, it needs to be recognized that there are some factual similarities and some differences. In the present case plaintiffs rely heavily on the fact that Goldman Sachs's highest rating, RL, was consistently given to Exodus stock until the very end of the class period, during which time Janiga knew that the rating was not deserved. But, unlike the claim in *Lentell,* here there is a claim that certain specific information—indeed certain specific risks—were falsified and concealed. To summarize, plaintiffs allege that Janiga's notes and reports predicted that Exodus would recover from a weak first quarter or first half of 2001, and that such recovery would occur in the second half of 2001, thus producing a "back-end loaded" earnings picture for 2001. It is further alleged that Janiga predicted that this would usher in a profitable 2002. Plaintiffs further claim that Janiga included in his notes and reports certain specific projected figures

coming from the company, which Janiga in effect vouched for, as well as put forth certain estimates of his own. It is alleged that during the entire class period, Janiga, and therefore Goldman Sachs, knew that all this was false.

Thus, the complaint in the present case contains allegations of specific misrepresentations and specific concealed risks, which were absent in *Lentell.* In fairness to Janiga and Goldman Sachs, however, it needs to be recognized that the actual notes and reports are far more balanced and contain more warnings than the complaint indicates. However, for purposes of this opinion it will be assumed that the complaint contains sufficient allegations of misrepresentation. But there still remains the issue of loss causation.

The heart of plaintiffs' claim of loss causation is contained in Paragraph 73 of the complaint, which states:

Exodus' stock price fell significantly starting on June 14, 2001 through June 21, 2001, as disclosures were made which together constituted the manifestation of the risks that Janiga knew to exist throughout the Class Period but failed to disclose in his earlier reports, and Janiga lowered his materially inflated ratings and estimates for Exodus.

Thus the allegation is that the price of Exodus stock "fell significantly starting on June 14 through June 21, 2001." As will be described, the trend of the Exodus stock price during the entire class period—not merely during the few days from June 14–21—has an important bearing on loss causation. The complaint has no analysis of that trend, but only gives the subject brief, generalized notice in paragraph 72, which, as earlier indicated is under the heading "Transaction Causation." Paragraph 72 states:

The Exodus Analyst Reports issued on January 25 and 26, 2001; February 27, 2001; April 27, 2001; and June 1 and 11,

2001, while not causing an increase in the price of Exodus' stock, served to maintain that price well above the level the stock would have traded at had Defendants truthfully disclosed their negative beliefs about Exodus detailed in Paragraph 68 above.

The effect of this paragraph is to allege that those who purchased during the class period did so at inflated prices. This, of course, is an allegation of transaction causation as the complaint itself indicates.

As to loss causation, the question is: when, if ever, did the Exodus stock lose its value, and was that loss causally related to the claimed misrepresentation? Did the loss in value of the Exodus stock occur at the time of the disclosure of the allegedly concealed facts and the manifestation of the risks—*i.e.,* the period from June 14 to June 21, 2001? *See* Compl. ¶ 73. For the answer it is necessary to look at the record of Exodus stock prices during the entire class period. The court may take judicial notice of such prices.

On the first day of the class period—January 25, 2001—Exodus stock closed at 24.75. This was the day of the first research note complained about. One day later—on January 26—there was the comment about Exodus in Goldman Sachs's Internet Weekly. From January 29 to the 31st, Exodus stock was selling at 26 and a fraction, but then began drifting downward. By the time of the February 27 note complained about, Exodus stock was down to 14.25.

Following the February 27 note, the price of the Exodus stock hovered in the 14 to 15 area, reaching a high of 15.75 on March 7. Then, the stock began a gradual decline, so that by April 27, the date of the next note complained of, the price was 9.00.

Following the issuance of the April 27 note, the stock rose to 11.11 on May 2 and then it quickly came down to the 8 to 9 range, where it remained until May 29. In the next two weeks the stock drifted down in slow steps to close at 5.01 on June 14.

This was first day of the period (June 14—June 21) when the complaint alleges that disclosures were made that manifested the risks that Janiga knew to exist during the class period. During the period, from June 14 to June 21, the stock price declined from 5.01 to 1.59.

The essential point is that by the time of the disclosures which allegedly caused the economic loss (as defined by the loss causation doctrine) the stock had already lost almost all its value—declining from 24.75 on January 25 to 5.01 on June 14.

The conclusion from all these circumstances is that the events of June 14 to June 21, which are said in the complaint to have brought about the economic loss, *did not do so.* The loss in value of the stock occurred gradually over the course of the entire class period, and the stock had lost most of its value before the June 14–21 events. This gradual loss of value occurred during the time when the alleged false and misleading comments of an optimistic nature were being issued. The complaint does not even refer to the phenomenon of the gradual loss of the stock's value, much less attempt to explain it as related to loss causation.

The court concludes that the complaint does not adequately plead loss causation.

### Conclusion

For the foregoing reasons, the complaint is dismissed.

SO ORDERED.